DAIRY FARMERS of AMERICA, INC., Liberty Mutual Insurance
Company, and Bud Duncan Trucking *v.* Lonnie COKER

CA 06-769                                          255 S.W.3d 905

Court of Appeals of Arkansas
Opinion delivered April 25, 2007

*Rieves, Rubens & Mayton,* by: *David C. Jones,* for appellants.

*The Brad Hendricks Law Firm,* by: *Lamar Porter,* for appellee.

LARRY D. VAUGHT, Judge. The Arkansas Workers' Compensation Commission found that appellee Lonnie Coker sustained a compensable injury while in the course and scope of his employment as a milk hauler for Bud Duncan Trucking and that Duncan Trucking was a subcontractor of appellant Dairy Farmers of America (DFA). After determining that Duncan Trucking was an uninsured employer, the Commission held that DFA was liable for Coker's benefits pursuant to Ark. Code Ann. § 11-9-402(a) (Repl. 2002). We affirm.

At the hearing, Coker testified that on September 17, 2003, before he left his home, he was injured while working on a truck owned by his employer Duncan Trucking. He testified that he had parked his truck at his home the evening before his accident. The next morning, he began his work day by filling out some paper-

work, replacing a headlight on the truck, and conducting a pre-trip inspection; he stated that his truck was already loaded with milk for delivery. Coker explained that each morning — prior to beginning his route — he engaged in a routine of knocking loose a "sticky" brake rod so that the truck could be "roll started." Coker stated that he "was underneath the truck, and the brake system failed" and ran over him "with both sets — both duals on the rear of the truck." After being run over by the truck, according to testimony, Coker was dragged a short distance. The medical records indicate that he sustained various injuries — including a collapsed lung and bladder, a spleen rupture, a crushed pelvis and tail bone, and several cracked ribs. The parties do not dispute the legitimacy of his injuries or treatment.

Bob Duncan, the owner of Duncan Trucking, confirmed that Coker was working on a truck owned by the company when he was injured and acknowledged that checking the truck before he departed "would be a part of his job." Duncan also corroborated Coker's claim that there was milk on the truck at the time of his injury and that he took the truck home at night because Duncan Trucking did not provide a convenient place to park the truck. Duncan also admitted that Duncan Trucking paid Coker's salary, withheld taxes from his paycheck, and supplied him a W-2 form at year's end.

The Commission found that Duncan Trucking was "clearly in the hauling business" and that Coker's "work as a truck driver was an integral part of that business." Based on the evidence, the Commission determined that Coker's injury arose out of and in the course of his employment with Duncan Trucking. The Commission also found that the uncontroverted evidence showed that Duncan Trucking failed to secure workers' compensation insurance as required by law. As such, the Commission turned its attention to the relationship between Duncan Trucking and DFA.

The Commission determined that DFA had contracted with its members to market the members' milk product. In support of its conclusion, the Commission relied on language from two sample contracts, which were introduced at the hearing. Both contracts contained provisions obligating DFA "to perform all services in connection with the hauling, handling and all other aspects of marketing Member's milk" and giving DFA "full power and authority . . . to collect and allocate funds in connection with the

sale of its members' milk." The DFA's field representative, Elbert Qualls, offered testimony that corroborated the contractual duty that DFA owed its members.

As a point of interest, the contracts also contained language that DFA was authorized to "transport Member's milk or have Member's milk transported by a carrier [hauler] approved by DFA to the destinations directed by DFA." DFA argued that this provision established that the haulers were independent contractors and not subcontractors, thus DFA had no liability under Ark. Code Ann. § 11-9-402. On this point, Bud Duncan testified that he understood himself to be an independent contractor, with the freedom to contract with whomever he wanted. He acknowledged that he had been hired by DFA to haul milk for its members. However, Duncan noted that he hired and fired his own drivers, and if DFA had a problem with one of his drivers it discussed that problem with Duncan, not the driver. Duncan testified that he, not DFA, controlled Coker's daily activities and that Coker was not working for anyone else at the time of the accident.

As a final line of defense, DFA argued that it could not be considered a general contractor because it had no obligation to a third party. DFA claimed that it was a cooperative association that was indistinguishable from its membership. The Commission rejected this argument and found that DFA was an "entity distinct from its membership, with full power to contract with those members."

After resolving these intermediary questions, the Commission ultimately concluded that DFA was a general contractor because it had a contractual obligation to haul milk for its members and that Duncan Trucking was a subcontractor because DFA "farmed out" its milk-hauling duty to Duncan Trucking. Based on these findings, the Commission applied the statutory mandate that when "a subcontractor fails to secure compensation required by this chapter, the prime contractor shall be liable for compensation to the employees of the subcontractor" and required DFA to pay Coker's benefits. See Ark. Code Ann. § 11-9-402(a). It is from this decision that DFA appeals.

In appeals involving claims for workers' compensation, we review the evidence in a light most favorable to the Commission's decision and affirm the decision if it is supported by substantial evidence. *Searcy Indus. Laundry, Inc. v. Ferren*, 82 Ark. App. 69, 110 S.W.3d 306 (2003). Substantial evidence is evidence that a reason-

able mind might accept as adequate to support a conclusion. *Id.* The court will not reverse the Commission's decision unless it is convinced that fair-minded persons with the same facts before them could not have reached the conclusions arrived at by the Commission. *Id.*

On appeal, DFA first contends that at the time of his injury Coker was not acting within the course and scope of his employment. Its argument is twofold. First, DFA claims that classifying Coker's activities as falling within the "course and scope of his employment" would "open the door to countless creative types of claims and lead to obscure results." Second, DFA alleges that the "going and coming rule" precludes recovery for Coker's injuries because 1) a witness speculated that Coker might be going to the bank on the day of the accident, and 2) the record was unclear as to whether Coker was actually going to operate the truck to haul the milk or if he was going to "subcontract" the load to another person.

Certainly, in order for an accidental injury to be compensable, it must arise "out of and in the course of employment." Ark. Code Ann. § 11-9-102(4)(A)(i) (Repl. 2002). A compensable injury does not include injuries "inflicted upon the employee at a time when employment services were not being performed." Ark. Code Ann. § 11-9-102(4)(B)(iii). And an employee is performing "employment services" when he or she is "doing something that is generally required by his or her employer." *Pifer v. Single Source Trans.*, 347 Ark. 851, 69 S.W.3d 1 (2002).

We use the same test to determine whether an employee was performing "employment services" as we do when determining whether an employee was acting within "the course of employment." *Id.* The test is whether the injury occurred "within the time and space boundaries of employment, when the employee was carrying out the employer's purpose or advancing the employer's interest either directly or indirectly." *White v. Georgia-Pacific Corp.*, 339 Ark. 474, 478, 6 S.W.3d 98, 100 (1999).

In this case there was evidence, which the Commission deemed credible, that Coker was required to keep his milk-hauling truck at his home, that the truck had already been loaded with a quantity of milk, that before his accident he had already completed a compulsory pre-trip inspection and repairs to the truck, and that he was in the process of launching his truck when his injury occurred. Each of these activities directly benefitted

Duncan Trucking. As such, because the Commission's finding that Coker was injured in the course and scope of his employment is easily supported by the substantial evidence presented at the hearing, we affirm on this point.

■ Further, despite DFA's repeated urging that the "going and coming rule" be applied to this case, we conclude that this rule does not lend itself to the facts and circumstances before us. The doctrine ordinarily precludes recovery for an injury sustained while an employee is going to or returning from his place of employment because the employee is not within the course and scope of his employment while traveling to and from his job. *See Wentworth v. Sparks Reg'l Med. Ctr.*, 49 Ark. App. 10, 894 S.W.2d 956 (1995). However, Coker was neither coming nor going from his place of employment. Instead, he was actively performing functions for the benefit of his employer. The fact that Coker performed these services while in the driveway of his home is irrelevant to the analysis.

Next, we turn our attention to the more complex portion of this appeal — whether the Commission properly applied Ark. Code Ann. § 11-9-402(a). After reading the briefs and the dissent filed by the Commission, we note a great deal of confusion surrounding the terms "subcontractor," "general contractor," and "independent contractor." The effect of a misunderstanding involving one (or all) of these terms is further compounded by the fact that many workers' compensation awards either fall or stand based on which of these classifications an entity receives. Therefore, we take this opportunity to attempt to clarify these three terms.

■ First, the most easily understood of the three is the term "subcontractor." As we stated in *Bailey v. Simmons*, 6 Ark. App. 193, 196, 639 S.W.2d 526, 528 (1982):

> A subcontractor is one who enters into a contract with a person for the performance of work [that] such person has already contracted to perform. In other words, subcontracting is merely "farming out" to others all or part of work contracted to be performed by the original contractor.

Therefore, before there can be a "subcontractor" there must first be a "prime contractor" or a "general contractor." If a person or entity performs all or part of a contract that another party procured, it is a

subcontractor. Whether the subcontracting party operates independently is of no consequence — an entity or party can be both an independent contractor and a subcontractor. *Id.* The singular requirement for one to be a subcontractor is to perform all or part of another's contractual obligation to a third party.

■ Next, we examine the term "general contractor," which is a synonym for "prime contractor." The principal case relating to this classification is *Garcia v. A&M Roofing,* 89 Ark. App. 251, 202 S.W.3d 532 (2005). In *Garcia,* we determined that A&M Roofing was a general contractor, because it secured the job on which appellant was injured; was contractually obligated to a third person for the work being performed; and paid appellant to perform its contractual obligation. It was noted in *Garcia* that Mills, the owner of A&M Roofing, was a roofer and in the business of selling roofing materials. However, the fact that Mills (A&M Roofing) could have completed the contract that it was obligated to perform does not factor into its classification as a "general contractor." There is no requirement that in order for an entity to have an obligation to a third party, it must be able to actually complete the obligation. Instead, the "general contractor" test is simply whether a duty to a third party exists and whether all or part of the performance of that duty is subcontracted to another entity or party.

■ Finally, the concept of "independent contractor" is in need of explanation more than definition. This term most commonly relates to whether an employer can be considered a "statutory employer" for purposes of workers' compensation coverage. *See Franklin v. Ark. Kraft, Inc.,* 12 Ark. App. 66, 670 S.W.2d 815 (1984). In *Riddell Flying Service v. Callahan,* 90 Ark. App. 388, 206 S.W.3d 284 (2005), we set out numerous factors that may be considered in determining whether an injured person is an employee or an independent contractor for coverage purposes. Included in these factors are:

(1) the right to control the means and the method by which the work is done;

(2) the right to terminate the employment without liability;

(3) the method of payment, whether by time, job, piece or other unit of measurement;

(4) the furnishing, or the obligation to furnish, the necessary tools, equipment, and materials;

(5) whether the person employed is engaged in a distinct occupation or business;

(6) the skill required in a particular occupation;

(7) whether the employer is in business;

(8) whether the work is an integral part of the regular business of the employer; and

(9) the length of time for which the person is employed.

*Id.* at 391–92, 206 S.W.3d at 287–88. The ultimate question in determining whether a person or entity is an independent contractor is not whether the employer actually exercises control over the doing of the work, but whether he has the right to control the work. *See Irvan v. Bounds*, 205 Ark. 752, 170 S.W.2d 674 (1943); *Wright v. Tyson Foods, Inc.*, 28 Ark. App. 261, 773 S.W.2d 110 (1989). However, the terms independent contractor and subcontractor are not mutually exclusive — a party or entity *can* be both an independent contractor *and* a subcontractor.

■ Therefore, in analyzing whether there is substantial evidence to support the Commission's decision that DFA is obligated to pay Coker workers' compensation, the seminal question we must answer is whether DFA had a contractual obligation to a third party. We do not find merit in DFA's schizophrenic attempt to identify itself as both the third party and the contractor. The contracts admitted at the hearing demonstrate that DFA — in its capacity as a corporate entity with a board of directors making decisions on its behalf — entered into numerous contractual agreements with milk producers to haul their milk. Therefore, we hold that DFA was contractually obligated to a third party — the milk producers.

The evidence also shows that DFA subcontracted with Duncan Trucking, which was uninsured, to perform all or part of its contractual obligation to the milk producers. The testimony also established that Duncan Trucking was an independent contractor and not an employee of DFA because Duncan Trucking

exercised control over the work being done — it hired and fired its own drivers; it arranged its own methods and means of hauling the milk; and it owned its own trucks. However, Duncan Trucking's status as an independent contractor has no bearing on its subcontractor relationship with DFA. Duncan Trucking is both an independent contractor *and* a subcontractor.

■ Therefore, because DFA was a prime contractor that farmed out a portion of its contractual obligation to an uninsured subcontractor (Duncan Trucking), it is liable for the injuries Coker sustained in the course and scope of his employment with Duncan Trucking. As such, the Commission did not err by holding DFA responsible for Coker's workers' compensation benefits pursuant to Ark. Code Ann. § 11-9-402(a) (2005). The decision of the Commission is affirmed in its entirety.

Affirmed.

GLADWIN and BIRD, JJ., agree.